UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **SUTTON LEASING, INC.**, | **2:20-CV-10815-TGB-DRG** |
| Plaintiff, | |
| | **ORDER GRANTING PLAINTIFF'S VERIFIED MOTION FOR IMMEDIATE POSSESSION PENDING FINAL JUDGMENT AND/OR FOR INJUNCTIVE RELIEF (ECF NO. 2)** |
| v. | |
| **VETERANS RIDESHARE, INC. et al.**, | |
| Defendants. | |

This matter is before the Court on Plaintiff Sutton Leasing, Inc.'s Verified Motion for Immediate Possession Pending Final Judgment and/or for Injunctive Relief. (ECF No. 2). The Court previously granted Plaintiff's ex parte motion for temporary restraining order pursuant to M.C.R. § 3.105(E)(2)(a), which directed Defendants Veterans Rideshare, Inc., Veterans Express, LLC, Your Leasing Solution LLC ("YLS"), and Car Champs Finance, LLC (together "Defendants") to "refrain from damaging, destroying, concealing or disposing of, or using so as to substantially impair its value, the property until further order of the Court." ECF No. 4. Defendants answered Plaintiff's complaint and responded to Plaintiff's motion for possession. ECF Nos. 10, 14. The Court held a hearing on Plaintiff's motion and took testimony on the issue of

Plaintiff's attempts to inspect. For the reasons stated herein, the Court **GRANTS** Plaintiff's Motion for Immediate Possession Pending Final Judgment (ECF No. 2). Consequently, the appropriate sheriff(s) or court officer(s) will be ordered to seize the property within 21 days and deliver it to Plaintiff pursuant to M.C.R. § 3.105(E)(4)(c). This Order is limited to those Units in Defendants' possession or being stored by Defendants at a third-party storage facility. If any of the Units have been sold to third parties, the determination of Plaintiff's right to possession of those Units must await resolution as part any final judgment in this case. Moreover, Plaintiff's right to possession under this Order is limited by the requirement that Plaintiff must "surrender the property to the person adjudged entitled to possession, diligently prosecute the suit to final judgment, and pay any money that may be recovered against [it] in the action" pursuant to M.C.R. § 3.105(E)(4)(c)(ii).

## I. Background

Sutton Leasing is a Michigan-based business that specializes in vehicle fleet management and leasing vehicles ranging from passenger vehicles to large commercial trucks and haulers. ECF No. 1, PageID.3.

In January 2015, Sutton Leasing entered into a vehicle lease agreement with Scott Kohn d/b/a Car Champs Finance, LLC ("Car Champs Lease Agreement").[1] ECF No. 1-2. Pursuant to this Agreement,

---

[1] This agreement contains a Michigan choice of law provision and the parties do not dispute that Michigan law governs the agreement. ECF No. 1-2, PageID.37.

Sutton Leasing leased[2] various vehicles (hereafter "Car Champs Units") to Car Champs. After the Car Champs Lease Agreement was signed, the parties executed two addenda; the first permitting Car Champs to sublease the Car Champs Units to other entities, the second permitting Car Champs to assign the Car Champs Lease Agreement to an "affiliated or related party" in exchange for an additional $1 million security deposit. ECF Nos. 1-3, 1-4. Car Champs thereafter in 2017 gave notice that it intended to assign the Car Champs Lease Agreement to Defendant Veterans Rideshare and Defendant YLS. ECF Nos. 1-5, 1-6. Over the course of their business relationship, Plaintiff contends that it leased hundreds of vehicles to Car Champs, Veterans Rideshare, and YLS, and that under the agreement approximately 550 vehicles are currently being leased by Defendants. ECF No. 1, PageID.8.

The Car Champs Lease Agreement was executed on behalf of Car Champs by Mr. Kohn. Later Plaintiff learned that Kohn had been sued by the Consumer Financial Protection Bureau in 2018.  Subsequently, in 2019 Kohn was indicted in South Carolina on federal criminal charges for operating a Ponzi scheme. ECF No. 1, PageID.8-9. Plaintiff also asserts that in 2018, Kohn transferred ownership and control of Car Champs, Veterans Rideshare and YLS to Christopher Pozek, and that it

---

[2] The parties dispute whether the Car Champs Lease Agreement was truly a lease, as Plaintiff asserts, or instead a "disguised installment sale" for the purchase of the vehicles, as Defendants claim. ECF No. 14, PageID.461.

was mostly Pozek with whom Plaintiff dealt throughout its business relationship with Defendants. ECF No. 1-8.[3]

After the South Carolina indictment, a Receiver was appointed (the "Receivership Proceeding") to sell off Kohn's assets and pay the victims of Kohn's Ponzi scheme. *Id.* When Plaintiff learned that the Receivership Proceeding had flagged Car Champs, Veterans Rideshare, and YLS as businesses "owned or controlled" by Kohn, Plaintiff contends that it intervened in the Receivership Proceeding to ensure that its fleet of vehicles was protected from being seized as assets of Kohn. The outcome of this intervention is memorialized in a "Settlement Agreement and Limited Release" executed on February 13, 2020 (hereafter "Settlement Agreement"). While various provisions of this Settlement Agreement are disputed by the parties (as discussed below), the Settlement Agreement states that "Sutton and Pozek agree that [Car Champs, Veterans Rideshare, and YLS] shall be solely responsible for (i) the Sutton Claim and (ii) any future monies owed to Sutton. The Receivership will not be responsible for any claims made by Sutton. . . ." ECF No. 1-10, PageID.61 ¶ 3.2. It also states that the "Receiver represents that as of the date he

---

[3] A second lease agreement was executed between Plaintiff and Defendant Veterans Express on December 28, 2019, an entity that does not appear to be affiliated with Mr. Kohn ("Veterans Express Lease Agreement"). ECF No. 1-9. As with the Car Champs Lease Agreement, Sutton Leasing leased various vehicles (hereafter "Veterans Express Units") to Veterans Express. And similarly, the parties dispute whether the Veterans Express lease agreement is a true lease or instead a "disguised installment sale." It does not appear that Kohn has ever had any relationship with Veterans Express. ECF No. 10, PageID.420.

executes this [Settlement] Agreement, his is unaware of any basis to make a claim or otherwise seek recovery against Car Entities, Pozek, or Sutton." *Id.* at PageID.62, ¶ 3.7.

With this as background, Sutton Leasing states that Defendants have engaged in numerous breaches of the Car Champs Lease Agreement and the Veterans Express Lease Agreement. It contends that Defendants have ceased normal business operations because they are financially unstable, and allowed insurance to lapse on the Units, forcing Plaintiff to purchase insurance at its own expense. ECF No. 1, PageID.12. Sutton Leasing also argues that Defendants have failed to make several of their monthly lease payments in the amount of $600,000. *Id. See also* Amy Blair Declaration, ECF No. 1-19.[4] Add to that the allegation that Pozek does not even know the location of all of the rented Units and has actively prevented Sutton Leasing employees from inspecting the Units. *See* ECF No. 1, PageID.12-13. *See also* Bob Blair Affidavit, ECF No. 1-16; Clyde Sutton Jr. Declaration, ECF No. 15-1.

## II. Evidentiary Hearing

The Court held an evidentiary hearing on this motion by video-conferencing[5] once it was fully briefed. ECF No. 21. In addition to hearing

---

[4] During the hearing, Clyde Sutton, Jr. (Co-President of Sutton Leasing) testified that in addition to the missed payments from February and March that are listed in the pleadings, Defendants have also failed to pay in April and May.

[5] This hearing was conducted via video conference on May 11, 2020 due to the COVID-19 pandemic and the closure of the Court's physical courthouse.

argument from both parties, the Court permitted testimony on Plaintiff's allegations that Defendants concealed the Units by twice preventing Sutton Leasing employees in March 2020 from conducting an inspection of Sutton Leasing vehicles located in a storage lot. Bob Blair, the Vice President of Midwest Sales and Sutton Leasing's point of contact with Defendants testified to the statements he made in his March 26, 2020 declaration. *See* ECF No. 1-16. And Mr. Clyde Sutton, Jr., Co-President of Sutton Leasing also testified to the statements he made in his declaration, filed May 8, 2020. ECF No. 15-1.

Both individuals testified to entering a California storage lot owned by Mr. Pozek in February and March 2020. Blair testified that he made two recent trips to California to inspect Sutton Leasing vehicles. The first time he visited, in early February, Bair stated that he had no trouble entering the lot to inspect. ECF No. 21, PageID.1754. He testified that he did not examine specific VIN numbers to verify whether the vehicles were in fact Sutton Leasing Units. *Id.* However, he believed they were Sutton Leasing vehicles because Blair was in California to prepare for an upcoming auction with Pozek to sell some of the Units. *Id.*, *id.* at PageID.1765-66.

When Blair came back on March 16, 2020[6], he arrived on the lot to inspect the Units and to discuss an auction that Pozek and Sutton

---

[6] March 16, 2020 is also the date that Sutton Leasing sent a demand letter to Pozek informing Pozek that it believed Defendants had engaged in material breaches of the

Leasing had agreed to partake in to sell some of the Units. *Id.* at PageID.1748-49. Blair conceded that he did not know whether some or all of the vehicles seen on the lot in fact were Sutton Leasing vehicles and that he only observed around 10 or so vehicles, though he believed many more vehicles were on the lot. *Id.* at PageID.1754; PageID.1763. Blair testified that once he was on the lot, Pozek was not there, but one of his associates, Scott West, was. *Id.* at PageID.1749. Blair stated that he observed the associate make a phone call; Blair believed the associate was calling Pozek and testified to overhearing some of their conversation. *Id.* Blair testified that after the call, he was told to leave the lot immediately, which he did. *Id.* at PageID.1750. Blair stated that he then went to a local police department, and then to Pozek's home, where Blair observed two vehicles in the front yard that he believed were Sutton Leasing vehicles. *Id.* at PageID.1749. Blair testified that after the incident, he spoke with Pozek via text message. *Id.* at PageID.1767. Blair testified that Pozek told him he would not be permitted on the lot. *Id.*

Blair also testified to his knowledge of a March 24, 2020 phone call he received from a storage company in Arkansas. *Id.* at PageID.1751, PageID.1757. A man from the Arkansas lot stated that a tow truck had arrived to pick up a vehicle owned by Sutton Leasing; the vehicle was leased to Defendant YLS. *Id.* The man stated that his "contact" for the

---

Car Champs and Veterans Express Lease Agreements and was seeking immediate repossession of the Units. ECF No. 1-15.

vehicle pickup were two women named Tammy and Regan. *Id.* Blair understands that Pozek's secretary is named Tammy and his daughter is named Regan. *Id.* For this reason, Blair—and Sutton Leasing—believed that Defendant YLS had ordered the tow truck service to move the vehicle from the storage facility. Blair testified that the vehicle was not in fact removed from the lot because the individual from the tow truck company had written the VIN down incorrectly.[7] *See also* Blair Affidavit, ECF No. 1-16.

Clyde Sutton Jr., Co-President of Sutton Leasing, testified that he went to inspect the California storage lot on March 19, 2020, after learning of Blair's unsuccessful attempt to inspect the lot. *Id.* at PageID.1768. Sutton said that when he arrived on the lot, he noticed a large trailer that was operating as Defendants' office; it had the name "Veterans" painted on one side. *Id.* He testified that a man named "Sharkey" introduced himself. *Id.* at PageID.1769. Sutton showed Sharkey a list of the 500-plus Units that Sutton Leasing claimed to own and said he was there to do an inspection of the vehicles. *Id.* Sutton testified that Sharkey at first happily complied and told Sutton that he had just completed his own inventory that he could share with Sutton.

---

[7] Blair also testified that he learned that at some point before his March 2020 visit to California that Sutton Leasing and Pozek had discussed the possibility of Sutton Leasing purchasing Defendant YSL from Pozek. The parties had discussed purchase prices ranging from $300,000 to $500,000, but the deal never materialized. ECF No. 21, PageID.1759. *See also* ECF No. 1-12 (Exh. K; emails)

*Id.* Sutton said that Sharkey went into the trailer. *Id.* During this time, Sutton testified that he walked around the lot while he waited for Sharkey and observed one vehicle that appeared to have its VIN purposefully covered. *Id.* at PageID.1770. When Sharkey came out of the trailer, Sutton testified that Sharkey told him that he just got off of the phone with someone (Sharkey did not say with whom) and Sharkey needed to ask Sutton to leave the lot. *Id.* Sutton stated that Sharkey never told him that any of the vehicles were involved with Sutton Leasing and conceded that if the vehicles were not Sutton Leasing Vehicles, Sharkey would have had no obligation to show Sutton the inventory list. *Id.* at PageID.1775-76.

Sutton also provided new information that had not been included in his declaration. *Id.* at PageID.1771-73. Sutton testified that over the past two weeks, employees in his office had reported getting calls[8] that trucks have been abandoned in storage lots for a number of months. *Id.* In some cases, the trucks had been taken in for repairs, but the bill never paid. *Id.* Other reports were that storage companies were asking Sutton Leasing to pay for storage and repairs before relinquishing the Units for repossession. Sutton confirmed that he did not know where all of the Units were and believed that the Units were not being properly maintained. *Id.*

---

[8] The Court allowed hearsay testimony for the limited purposes of the hearing. ECF No. 21, PageID.1772.

At the conclusion of the hearing, the Court ordered Defendants to produce a complete and accurate inventory of all of the Units within 48 hours and provide the inventory to Plaintiff. *Id.* at PageID.1793-94. If Pozek did not know the location of a Unit, he was to provide whatever information he had concerning the vehicle's last-known whereabouts; there should be an accounting of some kind provided as to each and every Unit. *Id.* The Court understands this list was provided to Plaintiff in a timely manner. *See* ECF No. 16; ECF No. 20-2 (Vehicle Location Charts). The Court also ordered that Plaintiff produce the titles for each of the Units as to which it claims rights of ownership and possession. Plaintiff supplemented the record with these records on May 15, 2020. *See* ECF Nos. 17-19.

On May 21, 2020, Plaintiff also sought leave to supplement the record with newly obtained evidence in support of its motion for immediate possession pending final judgment. ECF No. 20. That motion indicates that on May 14, Defendants produced a set of charts purporting to identify the vehicles' locations. *Id.* at PageID.1585-86. Plaintiff summarizes the contents of those charts as follows:

> a. Nearly 60 cars are "totally lost" and marked as having an "unknown" location;
> b. At least 3 trucks worth approximately $100,000 that are listed on the Location Chart as being held at a repair shop in California were actually ***sold at an action in December of 2019*** and are no longer at the location that Defendants said they were at';

     c. Another commercial truck listed on the Location Charts as being held at an "impounded" lot in Texas was actually abandoned at someone's private property, impounded by the Texas police for nearly 60 days, and ***sold at auction back in February 2020***;

     d. Over 100 vehicles that Defendants claim are at an auction lot in Moreland, Georgia are not actually there;

     e. Out of 21 vehicles listed as being held at a lot in Fontana, California, there are only 15 there, so an additional 6 are missing;

     f. There are 2 cars on the list that Sutton Leasing received notices for this week that are on the verge of being sold at auctions next week because they have been deemed "abandoned" pursuant to state law; and

     g. The vast majority of the vehicles are strewn around the country at various repair shops, junk yards, etc., and/or abandoned at gas stations and storage lots.

ECF No. 20, PageID.1586 (emphasis in original). In sum, Plaintiff indicates that "Sutton's research over the past several days has revealed that many of the locations listed on the Location Charts are simply wrong." Bob Blair May 21, 2020 Declaration, ECF No. 20-3, PageID.1618; *Id.* at PageID.1622 ("I have not completed the research for all 500+ vehicles, but so far, the majority appear to be lost, scattered across the country either in storage or at repair shops and junk yards.").[9]

     On June 4, 2020, Defendants responded to Plaintiff's motion to supplement. Defendants argued that the supplement did not contain any information that materially supported Plaintiff's motion. ECF No. 22. In response to Plaintiff's concern that the location charts were inaccurate,

---

[9] The Court granted Plaintiff's request to supplement and provided Defendants with an opportunity to respond. Text Only Order Entered June 1, 2020.

Defendants respond that they provided the "then-known locations of the Units." *Id.* at PageID.1802. Defendants offer no other explanation as to the discrepancies noted by Plaintiff. Defendants also assert that just because many of the Units may be "scattered" across the country, that does not demonstrate an act of concealment by the Defendants; it is simply "a function of the location of the actual uses or the mobile nature of the Units." *Id.* at PageID.1803. Finally, Defendants state that Plaintiff should simply pay any existing storage and/or repair fees to prevent Units from being sold by third parties; but Defendants will not pay any such fees because they say they lack the "financial wherewithal" at this time. *Id.* at PageID.1805.

### III. Standards of Review

### A.   Motions for Possession Pending Final Judgment Pursuant to Michigan Court Rule 3.105

Plaintiff raises this motion under Michigan Court Rule 3.105, which allows an action for "Claim and Delivery," one of Michigan's remedies for seizing property before a final judgment.  Such a state remedy may be pursued in federal court under Federal Rule of Civil Procedure 64, "Seizing a Person or Property," which provides:

> (a) Remedies Under State Law—In General. At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies.

(b) Specific Kinds of Remedies. The remedies available under this rule include the following—however designated and regardless of whether state procedure requires an independent action:

- Arrest;
- Attachment;
- Garnishment;
- Replevin;
- Sequestration; and
- Other corresponding or equivalent remedies.

Fed.  R. Civ. P. 64. As to the requirements of Michigan Court Rule 3.105,

which allows for "Claim and Delivery," that rule provides as follows:

(A) Nature of Action; Replevin: Claim and delivery is a civil action to recover

(1) possession of goods or chattels which have been unlawfully taken or unlawfully detained, and

(2) damages sustained by the unlawful taking or unlawful detention. A statutory reference to the action of replevin is to be construed as a reference to the action of claim and delivery.

(B) Rules Applicable. A claim and delivery action is governed by the rules applicable to other civil actions, except as provided in MCL 600.2920, and this rule
. . .

(E) Possession Pending Final Judgment.

(1) Motion for Possession Pending Final Judgment. After the complaint is filed, the plaintiff may file a verified motion requesting possession pending final judgment. The motion must

(a) describe the property to be seized, and

(b) state sufficient facts to show that the property described will be damaged, destroyed, concealed, disposed of, or used so as to substantially impair its value, before final judgment unless the property is taken into custody by court order. . . .

13

M.C.R. 3.105. The rule further explains what elements the plaintiff must establish for the court to order possession:

> (E)(3)(b) At the hearing, each party may present proofs. To obtain possession before judgment, the plaintiff must establish
>
>> (i) that the plaintiff's right to possession is probably valid; and
>>
>> (ii) that the property will be damaged, destroyed, concealed, disposed of, or used so as to substantially impair its value, before trial.

M.C.R. 3.105(E)(3)(b).

Therefore, in order for the Court to grant Plaintiff's motion for immediate possession pending final judgment pursuant to M.C.R. 3.105, Plaintiff must establish that its right to possess the Units is *probably* valid and that the Units *will be* damaged, destroyed, concealed, or disposed or used in a manner that substantially impairs their value if the Court does not grant Plaintiff possession pending trial.

**B.  Motion for Preliminary Injunction Pursuant to Fed. R. Civ. P. 65**

A motion for possession pending final judgment pursuant to M.C.R. 3.105 is comparable to a motion for a preliminary injunction pursuant to Fed. R. Civ. P 65, and federal courts in this district often consider standards of both rules when faced with such a motion. *See Nissan Motor Acceptance Corp. v. Isselhardt Auto., LLC*, No. 2:18-cv-13804, 2018 WL 8806094, at *1 (E.D. Mich. Dec. 12, 2018); *Ordos City Hawtai Autobody*

*Co., Ltd. v. Dimond Rigging Co., LLC*, No. 13-14909, 2014 WL 2559264, at *8-10 (E.D. Mich. June 6, 2014). Rule 65(b) requires this Court to balance and consider four factors in determining whether a preliminary injunction is proper: (1) the likelihood of the plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985). These four factors are to be balanced; they are not prerequisites that must be met. *Id.* at 1229.

## IV. Analysis

### A.   Whether Plaintiff has established probable right to possession of the Units

To support its claim that it has a right to possess all 537 Car Champs Units and Veterans Express Units, Plaintiff alleges in its verified complaint that it is the title owner of the vehicles that it leases to Defendants. ECF No. 1, PageID.4. Plaintiff cites to Section 21(f) of the Car Champs Lease Agreement, which states that "Lessee shall not, pursuant to this Agreement, the Leased Unit Quotation, or any documents delivered in connection with the lease of any Unit, acquire any right, title or interest whatsoever, legal or equitable, in or to such Unit." ECF No. 1-2, PageID.37. This language also appears in the Veterans Express Lease Agreement. *See* ECF No. 1-9, PageID.58.

At the Court's request, Plaintiff also submitted the titles for the vehicles for the record. *See* ECF Nos. 17-19. Having reviewed these titles, it is clear that they list Plaintiff as the owner and lessor of the vehicles, the various Defendants as the lessees, and JP Morgan Chase Bank NA as the holder of a security interest. *See, e.g.*, ECF No. 17-1, PageID.588 (Michigan); ECF 17-2, PageID.634 (California).[10] Defendants are either not identified on the titles at all or are listed as the "lessee," while Sutton Leasing is identified as the lessor and JP Morgan Chase is listed as the lienholder with a security interest in the vehicle.

Plaintiff also provides an explanation for a number of titles that it has been unable to produce.   For example, Plaintiff states that it submitted 26 titles to the Michigan Secretary of State in February 2020, and it has yet to receive the titles back from the State. ECF No. 17, PageID.586. It also states that 11 titles were sent to the Defendants in the "winter of 2020 for vehicles that were being prepared to be sold at an auction in California, because the original title has to accompany the vehicle at the time of sale." *Id.*[11] Finally, Plaintiff reiterates a point made

---

[10] It appears that while some vehicles have titles in states like Florida, Georgia, and Indiana, only California and Michigan require the lessee of a vehicle appear on the title. *See* ECF No. 17, PageID.585; M.C.L. 257.217(2)(b) ("An applicant for registration of a leased pickup truck or passenger vehicle that is subject to registration under this act . . . shall disclose in writing to the secretary of state the lessee's name, the lessee's bona fide residence, and . . . (b) If the lessee is a firm, association, partnership, limited liability company, or corporation, the lessee's business address.").

[11] This is consistent with Blair's testimony that he originally went to California in February 2020 to auction some of the Units for sale with Pozek.

in its original motion, that 12 titles are currently in Defendants'
possession and that Plaintiff believes Defendants have either lost or are
refusing to return them. *Id. See also* ECF No. 1-16, PageID.115.

Defendants make two arguments with respect to Plaintiff's right to
possess the Car Champs Units and the Veterans Express Units. First,
they contend that Plaintiff has no right to possess the Car Champs Units
because the February 2020 Settlement Agreement superseded the Car
Champs Lease Agreement and (as Defendants argue that the leases were
actually security agreements) Plaintiff did not preserve its security
interest in those units in the Settlement Agreement. Second, Defendants
assert that the Car Champs Lease Agreement and the Veterans Express
Lease Agreement are really security agreements in disguise and that
because Sutton Leasing did not perfect its security interest in the
agreements, Sutton Leasing does not have a right to possess the vehicles.

### i.   Whether the February 12, 2020 Settlement Agreement supersedes the original Car Champs Agreement

Defendants contend that Plaintiff cannot show that it has a
probable right to possession of the Car Champs Units[12] because the
February 12, 2020 Settlement Agreement entered into as part of the
Kohn Receivership Proceeding "superseded" the terms of the original Car
Champs Agreement. Consistent with their argument that the leases are

---

[12] The Settlement Agreement does not appear to address Veterans Express or the
Veterans Express Units.

17

actually security agreements, Defendants maintain that the Settlement Agreement does not preserve Sutton Leasing's security interest in the Car Champs Units and therefore Plaintiff no longer has a right to possess those units. ECF No. 14, PageID.471-72.

Defendants contend that because the Settlement Agreement does not expressly provide Plaintiff a right to possession of the Car Champs Units or expressly preserve Plaintiff's security interest in the Car Champs Units, Plaintiff has no right to possession. But an examination of the language of the Settlement Agreement reveals that this is not the case. By its own terms, the Settlement Agreement was entered into in order to clarify whether the Car Champs Units were assets of the Defendants, and therefore potentially subject to the Kohn Receivership Proceeding. ECF No. 1-10, PageID.61, ¶ G ("The Parties now desire to resolve, based upon representations made herein and by Pozek and Sutton to the Receiver, the issue of the Receiver's control of the Car Entities.").

Defendants point to Section 8 of the Settlement Agreement to argue that the Settlement Agreement was intended to supersede the Car Champs Lease Agreement. Section 8 states:

> **Mutual General and Limited Release.** Except for the rights and obligations of the Parties arising out of this Agreement, *specifically those set forth in Section 3* and limitations set forth herein, all Parties hereby release, acquit, and forever discharge each other as well as their respective past and present subsidiaries, parents, affiliates, . . . from any

and all past, present and future claims of every kind, type and description, known or unknown, direct or consequential, foreseen or unforeseen, which have been, could have been, or may be asserted by and between the Parties. *Nothing herein shall operate or otherwise be construed to operate as a release or discharge of any obligations of the Receiver, Pozek, or Sutton under this Agreement.*

ECF No. 1-10, PageID.63 (emphases added). Defendants assert that paragraph 8 released Car Champs, Veterans Rideshare, and YLS from the Car Champs Lease Agreement and any "security interest" in the Car Champs Units. Consequently, Defendants argue, any "claim" Sutton Leasing has is for monetary damages, not possession of the Car Champs Units themselves. ECF No. 14, PageID.471.

But Section 8 is expressly limited by Section 3. Section 3, in turn, provides that the intention of the Settlement Agreement was to "compromise and fully resolve all known issues, disputes, liabilities, and claims existing between them *regarding the Car Entities and their inclusion in the Receivership.*" ECF No. 1-10, PageID.61 (emphasis added). It also states that "Sutton and Pozek agree that the Car Entities [Car Champs, Veterans Rideshare, and YLS] shall solely be responsible for (i) the Sutton Claim and (ii) any future monies owed to Sutton." *Id.* at ¶ 3.2. A plain reading of Section 3 demonstrates that the Settlement Agreement did not operate to supersede or change the terms of any claims *between* Plaintiff and Defendants Car Champs, Veterans Rideshare, and YLS. The Settlement Agreement was directed at

clarifying that the Car Champs Units were not assets of Defendants and therefore they could not be captured by the Receiver.[13]

In sum, the Settlement Agreement in no way contravenes Plaintiff's "probable" right to possession as evidenced by the titles Plaintiff has produced for the record. *See* ECF Nos. 17-19. While Defendants may or may not be able to adduce evidence at trial tending to disprove Plaintiff's right to permanent possession, the terms of the Settlement Agreement do not undercut Plaintiff's showing of a probable right to possession at this stage.

### ii.   Whether Plaintiff is the title owner of the Units

Defendants next argue that the Car Champs and Veterans Lease Agreements did not create "true" leases, but instead created "disguised" installment sales for the purchase of the Units. ECF No. 14, PageID.461. They assert that because the lease transactions were in fact installment sales contracts that did not create any security interest in the vehicles as collateral for Plaintiff, they are like unsecured loans to Defendants, and Plaintiff has no probable right to possession of the vehicles. Plaintiff argues that regardless of whether the Lease Agreements created "true" leases or "disguised" installment contracts, Defendants have defaulted

---

[13] It also appears that Pozek himself did not view the Settlement Agreement as operating to supersede or change the terms of the underlying Car Champs Lease Agreement or otherwise transfer ownership of the vehicles from Plaintiff to Defendants. In March 2020 emails between Pozek and employees of Sutton Leasing, Pozek describes the vehicles as "assets on the Sutton line." ECF No. 1-12. Pozek did not assert in these emails that he owned the vehicles.

on the Lease Agreements by failing to pay their monthly rents, and therefore, pursuant to the Agreements' terms, are empowered to repossess the vehicles.[14]

Defendants argue that if the leases are actually deferred payment sales contracts, Plaintiff's rights to the vehicles would depend on whether they included a security agreement that created a security interest in the vehicles that Plaintiff has properly "perfected."  *See* M.C.L. § 440.3908.[15] Defendants rely on *GEO Finance, LLC v. University Square 2751, LLC*, 105 F. Supp. 3d 753 (E.D. Mich. 2015), in which the court explained the critical role of perfection of a security interest in determining a party's rights to leased equipment. In *GEO Finance*, the court was tasked with determining the ownership of geothermal water supply systems installed in two apartment buildings in Detroit. *Id.* at 756. The plaintiff acquired the company that was the system's installer and claimed right to the equipment, as well as monthly maintenance charges under the agreement. *Id.* The defendant purchased the buildings following

---

[14] While Plaintiff provided an affidavit from Amy Blair, then-President of Sutton Leasing attesting to Defendants' nonpayment, Defendants did not refute these statements through Pozek's declarations. *See* ECF No. 1-19; ECF No. 10-2; ECF No. 14-2, PageID.518-521.

[15] "Except as otherwise provided in this section and section 9309 [regarding security interests that perfect upon attachment], a security interest is perfected if it has attached and all of the applicable requirements for perfection in sections 9310 through 9316 have been satisfied. A security interest is perfected when it attaches if the applicable requirements are satisfied before the security interest attaches." M.C.L § 440.9308(1). This includes the requirement that a financing statement be filed. M.C.L. § 440.9310(1).

foreclosure proceedings. *Id.* The plaintiff brought a three-count complaint claiming breach of contract, conversion, and unjust enrichment, arguing that it was entitled to collect monthly charges for operating the system and eventually recover the equipment, claiming the agreement was a lease. *Id.* Conversely, the defendant argued the agreement was a financing arrangement and that the systems' equipment was a building fixture. *Id.* Because neither plaintiff nor its predecessor in interest perfected their security interest by filing a financing statement, defendant argued that plaintiff's interests were extinguished by the foreclosure and sheriff's sale to the defendant, and therefore the defendant acquired the equipment free and clear. *Id.* After carefully discussing the tests for determining whether an agreement is a true lease or a security agreement, the court concluded that the water supply agreement was a "true" lease. *Id.* at 763. Because it was a true lease, the plaintiff had the right to possess the equipment and judgment was entered in its favor as to liability on the counts of conversion and unjust enrichment.

But Defendants' focus on perfection of the security interest misses the mark where the issue is a question of a lessor/creditor's interest as against the lessee/debtor itself. Perfection—the filing of a proper financing statement—is important in order to put the world on notice of a security interest and to make the secured party's rights enforceable against third parties. Here, Plaintiff (the lessor/creditor assuming it was

an installment sale) is seeking to assert its right to possession as against
*Defendants* (the lessee/debtor), not against third parties. And Sutton
Leasing's possessory interest is superior to that of Defendants because
Defendants concede to having defaulted on the agreements to which they
are signatories—they are not third-party purchasers of the vehicles
claiming to hold them free and clear of any unperfected security interest.

Whether a security interest can be enforceable against a *debtor* (i.e.,
Defendants), turns on the commercial law concept of attachment, rather
than perfection. *See Michigan Tractor & Mach. Co. v. Elsey,* 216 Mich.
App. 94, 97–98, 549 N.W.2d 27, 30 (1996) ( "A security interest attaches
when it becomes enforceable against the debtor with respect to the
collateral.")[16] If no attachment occurs, the agreement between the seller
and debtor is not enforceable. As applied to this case, if the Lease
Agreements are in fact disguised installment contracts that do not
demonstrate proper "attachment," then Plaintiff's security interest under
the Lease Agreements in the vehicles would not be enforceable against
Defendants.

---

[16] Attachment occurs when all the events listed in subsection 1 of UCC 9–203, M.C.L.
§ 440.9203(1); M.S.A. § 19.9203(1), have taken place:

> (a) The collateral is in the possession of the secured party pursuant to
> agreement, or the debtor has signed a security agreement which
> contains a description of the collateral ...; and
> (b) Value has been given; and
> (c) The debtor has rights in the collateral.

*Michigan Tractor & Mach. Co. v. Elsey,* 216 Mich. App. 94, 97–98, 549 N.W.2d 27, 30
(1996).

Therefore, for purposes of the instant motion, the Court will consider whether the Car Champs and Veterans Express Lease Agreements appear more like "true" leases, rather than installment contracts with allegedly unenforceable security interests, to determine whether Plaintiff has a probable right to possession of the Units.

Courts employ two tests to determine whether an agreement creates a leasehold interest or a security interest: (1) the bright line test, and if the agreement is found to be a lease under that test, (2) the economics of the transaction test. *GEO Fin.*, 105 F. Supp. 3d at 761-63. The bright line test is contained in M.C.L. § 1203. That provision states:

> (1) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.
>
> (2) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease **and is not subject to termination by the lessee**, **and** any of the following are met:
>
>> (a) The original term of the lease is equal to or greater than the remaining economic life of the goods.
>>
>> (b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods.
>>
>> (c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.
>>
>> (d) The lessee has an option to become the owner of the goods for no additional consideration or for nominal

> additional consideration upon compliance with the lease
> agreement.

(Emphasis added).

If the agreement appears to be a true lease under the bright line test, then the court applies the economics of the transaction test. "Under that test, the court examines 'the specific facts of the case to determine whether the economics of the transaction suggest that the arrangement is a lease or a security interest.'" *GEO Fin.*, 105 F. Supp. 3d at 763 (quoting *In re Purdy*, 763 F.3d 513, 518-19 (6th Cir. 2014)).

> The precise contours of the economics-of-the-transaction
> test are rather unclear, but courts have largely focused
> upon two particular factors: (1) whether the lease
> contains a purchase option price that is nominal; and (2)
> whether the lessee develops equity in the property, such
> that the only economically reasonable option for the
> lessee is to purchase the goods.

*Purdy*, 763 F.3d at 520.

At this stage, in opposing Plaintiff's right to possession, Defendants have not adequately shown that the Lease Agreements are "disguised" installment contracts, while on the other side there is evidence in the record to suggest that they are "true" leases. For example, here, there can be no disagreement that the terms of the Lease Agreements provide that Defendants have the ability to terminate the leases at any time. *See* ECF No. 1-2, PageID.34 (¶6(b) "Lessee may terminate the lease of any Unit on thirty (30) days' notice of the date on which Lessee shall surrender such Unit to the Lessor."); ECF No. 1-9,

PageID.55 (same). Under the bright line test, then, the Lease Agreements would create leases, not security interests. M.C.L. § 1203(2) ("A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease **and is not subject to termination by the lessee**, **and** any of the following are met. . . .")(emphasis added).

Additionally, there is evidence in the record suggesting that under the "economics of the transaction" test, there is not a mandatory or a merely nominal buyout of the property. Defendants cite to Paragraph 15 of the Lease Agreements. *See* ECF No. 1-2, PageID.35; ECF No. 14, PageID.473. But Paragraph 15, roughly, states that if the lessee terminates the lease and the resale value of the vehicle is *greater* than the remaining balance of the base rental figure, the lessee retains the proceeds of the sale. ECF No. 1-2, PageID.35. Conversely, if the lessee terminates the lease and the resale value of the vehicle is *less* than the remaining balance of the base rental figure, then the lessee must pay the lessor the difference. *Id.* Further, the Lease Agreements state that the lessee "shall not . . . acquire any right, title or interest, whatsoever, legal or equitable, in or to such Unit." And while the Lease Agreements state that the lessee is responsible for a variety of costs, expenses, and fees on the Units, including repairs and maintenance, licensing, and inspections, M.C.L. § 440.1203(3) states that a lease does not create a security interest

26

merely because "(c) [t]he lessee agrees to pay, with respect to the goods . . . service or maintenance costs."

At this time, the features of the Lease Agreements suggest neither a nominal purchase price, nor that the lessee develops equity in the property such that the only economically reasonable option for the lessee at the end of the lease is to purchase the goods. Indeed, Plaintiff indicates that Defendants have *never* opted to purchase a Unit at the end of the lease. *See* Sutton Declaration, ECF No. 15-1, PageID.558 ("To the best of Sutton Leasing's knowledge, Defendants have not purchased any of the vehicles leased to them."). Therefore, because Plaintiff has adequately demonstrated at this stage that the Lease Agreements are true leases and not disguised installment sales contracts, there is no need at this point to address whether those contracts were security agreements that attached a security interest in the vehicles.  Rather Plaintiff may show its probable right to possession based on its rights under the leases as true leases.

The Court notes, however, that the question of whether the Car Champs Lease Agreement and the Veterans Express Lease Agreement created "true" leases or "disguised" installment contracts need not yet be determined with finality to resolve the question of whether Plaintiff has shown a probable right to possession. *See Loader Leasing Corp. v. Centurion Excavators Inc.*, 121 Mich. App. 510, 513, 328 N.W.2d 427 (1982) ("This provision lists several options for relief available to the trial

judge. It does not include granting final judgment to the claimant as if by motion. We must conclude that the provision allowing the trial judge to decide, at the hearing on prejudgment possession, that a defendant has no meritorious defense to a claim, no longer applies."). For the instant motion, the Court finds that Sutton Leasing has shown that its right to possess the Units is "probably" valid.[17] Because Plaintiff holds the titles to these vehicles, and those titles indicate that Defendants are merely lease holders in the vehicles, this evidence is sufficient to demonstrate a probable right to possession for purposes of the instant motion.

Having said that, it is also true that the record before the Court is unclear as to whether *some* of the vehicles covered by the Car Champs and Veterans Lease Agreements may have been sold to third parties without the knowledge or consent of Plaintiff. The Court concludes that Plaintiff's right to possession is limited to those Units that are in Defendants' possession or being stored by Defendants at a third-party storage facility. If any of the Units have been sold to third parties, Plaintiff's right to possession of those Units would need to await resolution of a final judgment in this case.

---

[17] Defendants also assert that there are numerous storage liens, maintenance and repair costs on many of the vehicles. But regardless of whether Defendants have a valid right to storage or repair costs from Plaintiff, the existence of storage liens does not refute Plaintiff's probable right to possession. *See Standard-Touch Chemicals, Inc. v. Victor Paint Co. Eastgate Corp.*, 367 Mich. 640, 643, 116 N.W.2d 745, 747 (1962) ("We have consistently held that the lonely issue in a replevin action is right of possession and that claims by way of set-off or recoupment are not permissible defenses to the action.").

28

**B.    Whether Plaintiff has established that the property *will* be damaged, destroyed, concealed, disposed of, or used so as to substantially impair its value before trial**

To take immediate, pre-judgment possession of the vehicles, Plaintiff must also demonstrate that the Car Champs Units and Veterans Express Units *will* be damaged, destroyed concealed, disposed of, or used so as to substantially impair their value before trial. M.C.R. 3.105(E)(3)(b)(ii). Allegations that the subject property *may* be damaged will not be sufficient. *Simmons v. City of Southfield*, 19-11726, 2020 WL 1868774, at *8 (E.D. Mich. Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 1866096 (insufficient evidence that vehicle in tow yard *would* be damaged, destroyed, concealed, etc. because plaintiff merely stated that vehicle would not be safe "exposed to the weather elements with electrical wiring hanging and exposed," and that the car has a cracked windshield which the weather could further damage"; damage by any third party was merely speculation). "Mere depreciation in value [if any] is not sufficient under the language of MCR 3.105(E)(3)(b)(ii)." *Vehicle Dev., Corp. PTY, LLD v. Livernois Vehicle Dev., LLC*, 2013 WL 6196965, at *3 (E.D. Mich. Nov. 27, 2013).

Here, Plaintiff has adequately established that the Units *will* be damaged, destroyed, concealed or used to so as to substantially impair their value in part because Plaintiff has provided evidence that at least

some of the Units *already have* been damaged, destroyed, concealed, or used so as to substantially impair their value.

First, Plaintiff has already shown that some concealment has occurred. Both Blair and Sutton were prevented from entering the California lot and inspecting vehicles that they believed to be Sutton Leasing vehicles.[18] Defendants also conceded—both in their answer to Plaintiff's verified complaint, and at the hearing on Plaintiff's motion— that Pozek does not know the location of all of the vehicles. *See* Defendants' Answer, ECF No. 10, PageID.423. This was further demonstrated, via Sutton's declaration and testimony, by proof that Sutton Leasing had received three calls within the prior two weeks about Sutton Leasing vehicles leased to the Defendants' that had been abandoned in New Mexico, Nevada, and Georgia. ECF No. 15-1. Sutton was told that the New Mexico vehicle had been sitting for a year and abandoned by YLS, was told that the Nevada vehicle had been sitting for approximately eight months, was not running and required repairs, and was told that the Georgia vehicle had been left at a repair shop for more

---

[18] During the evidentiary hearing, Defendants argued that Blair and Sutton did not know for certain that the vehicles on the lot were Car Champs Units or Veterans Express Units. But Blair testified that he believed at least some of the vehicles he observed on the lot in March 2020 were owned by Sutton Leasing because when he visited the lot the prior month, it was for the purpose of preparing to sell some of the Units at an auction with Pozek.

than six months and had accumulated almost \$4,000 in repair and storage charges that were never paid.[19]

If this were not enough, Plaintiff provided the Court with supplemental evidence on May 21, 2020, that several vehicles have been lost, abandoned, broken down, and in some cases, *sold* without Plaintiff's consent, as explained above. *See* ECF No. 20 (and accompanying exhibits). *See Nissan Motor Acceptance Corp. v. Isselhardt Auto., LLC*, No. 18-13804, 2018 WL 8806094, at *2 (E.D. Mich. Dec. 12, 2018) (noting that over the course of several inspections, inventory auditors were unable to locate 81 vehicles that Plaintiff had financed for Defendants). Sutton's declaration also spoke to the damage that results from abandoning and failing to use the Units, many of which are large industrial trucks running on diesel fuel. ECF No. 15-1. Defendants have also indicated that they have stopped operations (in some capacity) and Plaintiff has shown that Defendants do not have the financial capability to properly maintain the fleet. *See* ECF No. 1-13, PageID.88 (Pozek's March 9, 2020 email stating that "the cash flow is almost nonexistent currently since we had to shut down operations, as previously disclosed"); Defendants' Response, ECF No. 14, PageID.465 ("In the interests of full disclosure, the Defendants are each currently engaging California

---

[19] Plaintiff also provided the documentation showing that Sutton Leasing leased these vehicles to Car Champs and YLS and that there are significant past due rents and remaining base rental figures due on the vehicles. ECF No. 15-1, PageID.564-580.

bankruptcy counsel for the purpose of seeking appropriate bankruptcy protection to move forward with their respective plans of reorganization."). Finally, Plaintiff explains that Sutton Leasing has the duty to care for the Units for its lender JP Morgan Chase, who holds a security interest in each of the vehicles. If Defendants have the opportunity to continue to damage and destroy JP Morgan Chase's collateral, Plaintiff risks harm to their reputation with their lender.

The totality of the evidence presented by Plaintiff shows a kind of damage that is beyond "mere depreciation" in value. *See Ordos City Hawtai Autobody Co., Ltd. v. Diamond Rigging Co.*, No. 13-14909, 2014 WL 2559264, at *8 (E.D. Mich. June 6, 2014) (finding damage under M.C.R. § 3.105 where "the outdoor equipment has begun to suffer rusting and pitting, as well as potential electrical damage. Defendant has shown that it will be incapable of properly caring for the . . . equipment during the pendency of this litigation"). In sum, Plaintiff has shown that the Units "will be damaged, destroyed, concealed, disposed of, or used so as to substantially impair their value before trial." M.C.R. § 3.105(E)(3)(b).

## C.  Plaintiff has also proven the elements of a preliminary injunction

In order for the Court to grant a plaintiff a preliminary injunction, Rule 65(b) requires this Court to balance and consider four factors in determining whether a preliminary injunction is proper: (1) the likelihood of the plaintiff's success on the merits; (2) whether the

injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985). These four factors are to be balanced; they are not prerequisites that must be met. *Id.* at 1229. Plaintiff has met its burden here.

### i.    Likelihood of success on the merits

The Court will focus on Plaintiff's cause of action for Claim and Delivery when considering whether Plaintiff has shown a likelihood of success on the merits. *See Ordos*, 2014 WL 2559264, at \*9 (citing *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (finding that, for purposes of a preliminary injunction analysis, plaintiff need only show a likelihood of success on the merits of the issue most central to its claims, rather than all of its claims). Plaintiff is only requesting Defendants to relinquish possession of vehicles as to which Plaintiff maintains title and has a probable right to possession; it is not seeking an order restricting Defendants' rights or abilities in any other way.

"To prevail on a claim and delivery action, Plaintiff[] must prove that Defendant[s] unlawfully took or detained goods or personal property, to which Plaintiff[] ha[s] a right to possess." *Id.* As explained above, Plaintiff has shown that it has a probable right to possession at this time, despite Defendants' argument that the February 2020

Settlement Agreement supersedes or substantially alters the terms of the Car Champs and Veterans Express Lease Agreements, and despite Defendants' argument that the Lease Agreements created security agreements rather than "true" leases. Therefore, the Court finds that this factor weighs in favor of granting a preliminary injunction.

### ii. Threat of irreparable injury

To justify the grant of a preliminary injunction, the Court must find that Plaintiff will likely suffer irreparable injury without the injunction. *Ordos*, 2014 WL 2559264 at *9. "The movant must show that irreparable harm is likely, not merely possible." *Id.* (citing *H&H Ind., Inc. v. Miller*, 2013 WL 6858760 (S.D. Ohio Dec. 27, 2013) (slip copy) (citations omitted)). "A plaintiff's harm is not irreparable if it is fully compensable by money damages." *Basicomputer v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). As explained at length above, Plaintiff has shown that the vehicles "will be damaged, destroyed, concealed, disposed of, or used so as to substantially impair their value before trial" if repossession of the vehicles does not occur. M.C.R. § 3.105(E)(3)(b). Moreover, if Defendants have the opportunity to continue to damage and destroy the vehicles— JP Morgan Chase's collateral—Plaintiff risks harm to their reputation with their lender. Those harms are not easily compensable with money damages. *See Ordos*, 2014 WL 2559264 at *9. Thus, the Court finds it likely that Plaintiff will suffer irreparable injury if the Court does not issue a preliminary injunction.

### iii.   Balancing of potential harms

The Court also finds that Plaintiff will suffer more harm without an injunction than the Defendants will suffer if the Court issues an injunction. Plaintiff has provided evidence that several vehicles have been lost, abandoned, broken down, and in some cases, sold without Plaintiff's consent. *See* ECF No. 20 (and accompanying exhibits). Indeed, the testimony and exhibits suggests that Defendants have seemingly abandoned many of these vehicles and that they are unaware of the whereabouts of numerous vehicles. And to the extent that Defendants or others have valid liens on some or all of the vehicles, they may be addressed during the remainder of the litigation. *C.f.*, *Standard-Touch Chemicals, Inc. v. Victor Paint Co. Eastgate Corp.*, 367 Mich. 640, 643, 116 N.W.2d 745, 747 (1962) ("We have consistently held that the lonely issue in a replevin action is right of possession and that claims by way of set-off or recoupment are not permissible defenses to the action."). Plaintiff has established that the delay in receiving the vehicles is causing them harm, whereas Defendants seemingly are not using the vehicles. Therefore, the Court finds that the balancing of the harms falls in favor of granting the injunction.

### iv.   Public interest consideration

The Court finds that public interest considerations weigh in favor of granting an injunction. "The public has an interest in ensuring the right to possession of one's own property is enforceable. Additionally, the

public has an interest in property being put to productive use rather than sitting uselessly in a storage yard overseen by someone named "Sharkey". Both interests will be served by this Court's grant of a preliminary injunction." *Ordos*, 2014 WL 2559264 at *10. Thus, the Court finds this factor weighs in favor of granting an injunction.

Because all of the factors weigh in favor of granting a preliminary injunction, the Court shall, in the alternative, **GRANT** Plaintiff's Verified Motion for Injunctive Relief (ECF No. 2).

## V. Conclusion

For the reasons set forth above, Plaintiff's Motion for Immediate Possession Pending Final Judgment (ECF No. 2) is **GRANTED**. The appropriate sheriff(s) or court officer(s) is(are) ordered to seize the property within 21 days and deliver it to Plaintiff pursuant to M.C.R. § 3.105(E)(4)(c).[20] This **ORDER** is limited to those Units in Defendants' possession or being stored by Defendants at any third-party storage facility or other location. If any of the Units have been sold to third parties, Plaintiff's right to possession of those Units, if any, will be determined as part of reaching a final judgment in this case. Defendants shall fully cooperate with removal of the Units. Plaintiff is not required to post any bond. Plaintiff's right to possession under this Order is

---

[20] To effectuate this, the Court orders Defendants, at Plaintiff's request, to produce information related to the GPS bills of the Units to assist Plaintiff with reinstating GPS location services on the vehicles. ECF No. 20, PageID.1588.

conditioned on Plaintiff's agreement that it "will surrender the property to the person adjudged entitled to possession, diligently prosecute the suit to final judgment, and pay any money that may be recovered against [it] in the action" pursuant to M.C.R. § 3.105(E)(4)(c)(ii).

**IT IS SO ORDERED**.

DATED: June 19, 2020.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, June 19, 2020, by electronic and/or ordinary mail.

S/A. Chubb
Case Manager and Deputy Clerk